ANGELA LEVI, an individual,

Plaintiff,

v.

RICK BESELER, in his official capacity as the
SHERIFF of CLAY COUNTY; ANDRE
MACK, in his individual capacity; and KENNY
WEST, in his individual capacity,

Defendants.

Case No. 3:14-cv-1520-J-25-MCR

**JURY TRIAL DEMANDED**

## FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

**COMES NOW** the Plaintiff, ANGELA LEVI ("Ms. Levi"), by and through her undersigned Counsel, and hereby sues the Defendants, RICK BESELER ( "Sheriff Beseler"), in his official capacity as SHERIFF of CLAY COUNTY; ANDRE MACK ("Officer Mack"), in his individual capacity; and KENNY WEST ("Officer West"), in his individual capacity, and would respectfully show this Honorable Court the following:

### JURISDICTION AND VENUE

1.     This lawsuit is brought pursuant to the Fourth and Fourteenth Amendments to the United States Constitution, 42 U.S.C. §§ 1983 and 1988, and Florida law.

2.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 (federal question), 1343(a)(3) (civil rights), and 1367(a) (supplemental).

3.     Venue in this judicial district and division is proper, pursuant to 28 U.S.C. § 1391(b) and M.D. Fla. Loc. R. 1.02.  Plaintiff is a resident of this judicial district and division.

Furthermore, all events giving rise to Plaintiff's claims occurred in Clay County, Florida, in this judicial district and division.

<h2 style="text-align:center"><u>PARTIES</u></h2>

4.      Ms. Levi is, and at all times material hereto was, an individual who resides in Clay County, Florida, and whose son, then-fifteen year-old Hadrian Miguel Ramadan ("Hadrian"), tragically committed suicide on the evening of June 8, 2013.

5.      Sheriff Beseler is, and at all times material hereto was, acting under color of state law as the Sheriff of Clay County, Florida, as organized and existing under the Constitution and laws of the State of Florida.  In this cause, Sheriff Beseler acted through its agents, employees, and servants, including Officer Mack and Officer West.

6.      Officer Mack is, and at all times material hereto was, acting under color of state law as a deputy sheriff for Sheriff Rick Beseler at the CCSO, and in such capacity as an agent, servant, and employee of Sheriff Beseler.

7.      Officer West is, and at all times material hereto was, acting under color of state law as a deputy sheriff for Sheriff Rick Beseler at the CCSO, and in such capacity as an agent, servant, and employee of Sheriff Beseler.

<h2 style="text-align:center"><u>GENERAL ALLEGATIONS</u></h2>

8.      On the evening of June 8, 2013, Hadrian contacted his grandmother, Patricia Laughter ("Ms. Laughter") to let her know that he was suicidal and was armed with a firearm.

9.      After trying to console Hadrian and counsel him away from self-harm, Ms. Laughter contacted the CCSO to report what Hadrian had told her.

10.     At the time, Ms. Laughter and Ms. Levi were at their respective places of employment, and Hadrian was at his home, located at 109 Hercules Drive E., in Orange Park, Florida 32073, which is also Ms. Levi's and Ms. Laughter's home.

11.     Ms. Laughter then proceeded home, where she made contact with CCSO officers.

12.     Shortly after Ms. Laughter arrived at her home, at approximately 6:00 p.m., Ms. Laughter contacted Ms. Levi, who at the time was leaving her place of employment. Ms. Laughter urged Ms. Levi to drive home immediately, and thereafter, Ms. Levi rushed home.

13.     Before Ms. Levi arrived, Officer Mack sought to obtain from Ms. Laughter unconditional consent for CCSO officers to search her home. Ms. Laughter agreed to provide voluntary consent to search her home, but only for the limited purpose of searching for Hadrian. Ms. Laughter voiced this condition verbally, and she also reduced her limited consent to writing on the "Voluntary Consent to Search" form that Officer Mack provided her. The form initially indicated that the consent was limited to the "entire residence for Hadrian Rabadan 12-19-97" but Ms. Laughter wanted to be sure that the CCSO understood the limited nature of the consent that she was providing, and that they could search only for Hadrian. Thus, she added to the form, "only boy".

14.     Upon arriving, Ms. Levi found her neighborhood saturated with marked CCSO vehicles. She parked her vehicle away from her home and approached Ms. Laughter who was with CCSO officers, one of whom was Officer Mack.

15.     After Ms. Levi identified herself, Officer Mack sought to have Ms. Levi contact Hadrian's friend Alicia, who was believed to have provided Hadrian with a firearm earlier that day.

16.     Although Ms. Levi spoke with Alicia's mother by phone, Alicia's mother forbade Ms. Levi from speaking directly with Alicia.

17.     Officer Mack then told Ms. Levi, "I'm going to need to get some information on your son."  At this point, Officer Mack was sitting in the front driver's seat of his marked patrol car, while Ms. Levi was next to the front, driver's side door.  The front driver's side door window was rolled down all the way.  Mr. Jeffrey Jones ("Mr. Jones"), Ms. Levi's boyfriend, was standing next to Ms. Levi.

18.     Moments later, Ms. Levi heard a distant gunshot noise.  Scared, she immediately asked Officer Mack, "What the fuck was that?"  Officer Mack calmly replied, "Nothing."  In fact, Ms. Levi had just heard Hadrian commit suicide by a self-inflicted gunshot.

19.     As Ms. Levi started walking toward the direction from where the gunshot noise came, Officer Mack ordered Ms. Levi to come back towards his patrol car.

20.     Then, Ms. Levi witnessed as many as six uniformed CCSO officers, running by the side of Ms. Levi's home, towards her backyard.

21.     Officer Mack then insisted that Ms. Levi sit in the back seat of his patrol car, because it was hot outside, and his vehicle was air conditioned.  Submitting to Officer Mack's apparent authority, Ms. Levi then sat in the back seat of his patrol car with her feet hanging outside the car.  Mr. Jones was still standing adjacent to Officer Mack's vehicle.

22.     Moments later, Ms. Levi witnessed two Clay County Fire Rescue Department ("CCFRD") vehicles, including a fire truck and a rescue vehicle, drive towards the direction from where the gunshot noise came.

23.     Officer Mack insisted to Ms. Levi that the CCFRD vehicles were precautionary, but Ms. Levi's instincts told her that the CCFRD vehicles could not be precautionary.

24. Finally, Ms. Levi explicitly asked Officer Mack if her son was hurt. In response, Officer Mack said that the CCFRD vehicles were for an elderly lady down the street.

25. The CCFRD fire truck then stopped near Officer Mack's patrol vehicle, and the driver asked another CCSO officer where to go. The CCSO officer replied, "Ares," which is the name of a nearby street.

26. Officer Mack then ordered Ms. Levi to "Get in." Mack then shut the back door of his patrol car and sat back down in the driver's seat of his patrol car. He then asked Ms. Levi, "Where the fuck did your mother go?"

27. Seeing Ms. Laughter up ahead, adjacent to their home, Officer Mack pulled his vehicle up to her. As he was approaching Ms. Laughter, Officer Mack asked Ms. Levi if Ms. Laughter had a history of mental illness. Ms. Levi responded no, but explained that Ms. Laughter had "flipped out" when Ms. Laughter's mother died.

28. Officer Mack then ordered Ms. Laughter into the back seat of his vehicle. After Ms. Laughter initially refused, Officer Mack told her, "Get into the vehicle. I'm not going to ask you again."

29. Submitting to his apparent authority, Ms. Laughter complied, and she sat next to Ms. Levi in the back seat of Officer Mack's CCSO patrol vehicle.

30. Officer Mack then drove to the corner of Hercules and Aurora, where his vehicle remained with Ms. Levi and Ms. Laughter in his back seat, against their will, for approximately the next two hours.

31. During those two hours, Ms. Levi and Ms. Laughter asked Officer Mack several times, "Can you just tell me what's going on?" and also insisted several times that Ms. Levi and

Ms. Laughter were hot and uncomfortable, and that they desired to exit the vehicle. Ms. Levi explained to Officer Mack at one point that Ms. Laughter was becoming "hysterical".

32. Finally, Ms. Levi exclaimed to Mack, "You need to tell us what's going on."

33. Ms. Laughter then said that she was claustrophobic and that she was going to be sick. In response, Officer Mack went to her side of the car and let her head out of the door but refused Ms. Laughter's attempt to exit the vehicle.

34. Moments later, Officer Mack told Ms. Levi and Ms. Laughter that he had "been instructed to take you ladies to the Clay County Police Station." "For what?" they responded. Officer Mack replied, "There's going to be a detective who's going to talk with you."

35. Officer Mack refused to provide Ms. Levi and Ms. Laughter further information, despite repeated protests, questions and demands to understand the basis for their detention.

36. Officer Mack drove his vehicle, with Ms. Levi and Ms. Laughter still in the back seat, to the CCSO substation on Blanding Boulevard, but no one was there upon their arrival. Ms. Levi then asked, "Where are the detectives?" Officer Mack replied, "They're on their way."

37. Mr. Jones followed Officer Mack's patrol car, using Ms. Levi's vehicle.

38. Officer Mack then permitted Ms. Levi and Ms. Laughter to exit the vehicle. Then, Ms. Levi, while standing on the sidewalk outside the CCSO substation, began to cry.

39. Ms. Levi began to walk toward the CCSO substation building, but Officer Mack exclaimed, "Ma'am, you can't leave." Ms. Levi replied, "I'm not leaving; I'm getting some Kleenexes."

40. Officer Mack permitted Ms. Levi to go into the CCSO substation bathroom, but only after he made Ms. Levi give her car keys to Mr. Jones.

41.     While she was in the bathroom, Ms. Levi used her cell phone to contact the Orange Park Hospital's Emergency Department (the "OPHED"), where Ms. Levi presumed that Hadrian would have been taken if he had been injured.

42.     When Ms. Levi reached a nurse in the OPHED, Ms. Levi confirmed that Hadrian was present in the OPHED with a life-threatening gunshot wound.  The nurse then asked Ms. Levi, "Well, who are you?"  Ms. Levi responded, "I'm his mother."  The nurse then exclaimed, "Well, are you coming?"

43.     Ms. Levi then went immediately and directly to Officer Mack and told him that she needed to leave, because her son had a life-threatening gunshot wound.

44.     At that point, Ms. Laughter began to walk away in an attempt to leave the CCSO substation, but Officer Mack threatened her, saying "Don't make me have to arrest you."

45.     Ms. Levi then asked Officer Mack, "How much longer is it going to be?"  Officer Mack responded, "Five minutes."  Ms. Levi replied, "That's what you said five minutes ago," to which Officer Mack said, "I don't know."

46.     Ms. Levi then asked Officer Mack, "Do you have children?"  He responded, "Yes, I have two – a 13 year-old and a 17 year-old."

47.     Ms. Levi then said, "Well, I hope this never happens to you.  And you're detained and you can't be with your child."

48.     Officer Mack then relented and audibly said, "I'm going to lose my fucking job, but I'm going to take you to the hospital."

49.     Reluctantly, Ms. Levi and Ms. Laughter then sat back down in the back seat of his CCSO patrol car, and Officer Mack began driving towards the exit of the parking lot with Mr. Jones following in Ms. Levi's vehicle.

50.     Officer Mack then stopped his vehicle, as Officer West arrived and pulled his vehicle up next to Officer Mack's.

51.     Officer West demanded that Ms. Levi and Ms. Laughter exit Officer Mack's vehicle and sit down in Officer West's vehicle.

52.     Ms. Levi was about to comply with Officer West's order, but then realized that she might become trapped again.

53.     Ms. Levi then explicitly asked Officer West, "Are you taking me to the hospital?" Officer West responded, "No, a detective is going to come talk with you; we're going back to the building."

54.     Then, after having been polite and calm all evening long, Ms. Levi told Officer West, "You know what, with all due respect, fuck you. I'm going to see my son. You can send your detectives there."

55.     Ms. Levi then told Mr. Jones, "Jeff, give me the keys." Mr. Jones then complied and gave Ms. Levi the keys to her vehicle.

56.     Officer West then exclaimed to Mr. Jones, "Why the hell did you give her the keys?" Mr. Jones retorted, "She's right."

57.     Officer West then personally stepped in front of Mr. Jones's car in an effort to block Ms. Levi from leaving the parking lot. Officer West then yelled at her, "Ma'am, you cannot leave."

58.     But, Ms. Levi put the vehicle in reverse, backed the car up, and then, shifting the car to drive, drove up on the curb, drove around Officer West, and drove to the OPHED.

59.     Immediately after Ms. Levi arrived at the OPHED, four or five CCSO officers arrived.

60.     Ms. Levi ran into the OPHED and told the receptionist, "You have my son." Initially, the receptionist denied that Hadrian was at the OPHED. But, Ms. Levi then saw an old friend of hers named Sharon, with whom Ms. Levi had worked in the past.

61.     Ms. Levi convinced Sharon to permit Ms. Levi to enter the treatment area of the OPHED – outside the reach of the CCSO officers who were still pursuing her.

62.     Nevertheless, the CCSO officers did reach Ms. Laughter and were able to prevent Ms. Laughter from proceeding to the treatment area where Hadrian was literally moments away from breathing his last breath.

63.     Upon entering the treatment area, Sharon told a neurosurgeon that Ms. Levi was Hadrian's mother.

64.     The neurosurgeon then looked towards the entrance of the treatment area, where two CCSO officers had just entered and were approaching.

65.     Ms. Levi then stressfully asked the neurosurgeon, "Which way?" Ms. Levi had to repeat her question before the neurosurgeon answered, "Left."

66.     The two CCSO officers attempted to follow Ms. Levi, but the neurosurgeon stopped the two CCSO officers and forbade them from following Ms. Levi.

67.      Moments later, Ms. Levi found Hadrian's room. A CCSO officer was posted outside the room, and Ms. Levi asked him, "Is this the gunshot wound victim?" The CCSO officer replied, "yes."

68.     Ms. Levi then entered the room and saw her son, Hadrian, who was clearly suffering from a gunshot wound to his head. Hadrian had several monitors hooked up to him, all of which indicated that Hadrian was still alive, breathing independently, with a beating heart.

69.     Ms. Levi then spoke to Hadrian, telling him that she loves him. She then leaned in close to Hadrian and whispered into his ear, "Did you hear me, Nano? I said I love you."

70.     Then, Hadrian lifted his right arm and slammed it back on the table. Then, Ms. Levi heard Hadrian gurgle and stop breathing.

71.     Immediately, all of the monitors began emitting alarms.

72.     Nurses immediately reacted and came running into Hadrian's room.

73.     After a few moments, one of the nurses turned to a physician and said that they "were not getting anything" from Hadrian. The nurse asked the physician what to do.

74.     Ms. Levi interrupted and said, "Tube him. I want to save his organs."

75.     Hadrian was then placed on life support, and the physician told Ms. Levi that Hadrian would be transported to UF-Shand's Hospital.

76.     Shortly thereafter, Ms. Levi approached the CCSO officer who had been posted outside Hadrian's room, and Ms. Levi told him that she needed to sneak out the back door of the OPHED. The officer told her that he would permit her to do so.

77.     As Ms. Levi exited the OPHED via the ambulance entrance and exit, Ms. Levi saw that Officer Mack was outside the OPHED, standing with Mr. Jones, Ms. Laughter, and other CCSO officers.

78.     Ms. Levi approached them and told them all, "I need to go to Shands."

79.     Ms. Laughter, who theretofore had not learned of Hadrian's gunshot wound or recent death, was confused and asked Ms. Levi why.

80.     Finally, Ms. Levi looked at Ms. Laughter and explained, "Because that's where they're taking him."

81.     Ms. Laughter demanded to be permitted to drive her van from the OPHED, but Officer West told her that she would not be able to.  Officer West further told Ms. Laughter, "I'm done talking with you."

82.     Ms. Levi then asked Officer West if he knew what had happened to Hadrian. Officer West replied, "I was the first one to your son, and he was already shot."  Ms. Levi asked him if he had said anything, to which West replied, "No, but he did squeeze my hand and blink his eyes, but no other response."  Ms. Levi later discovered both of these statements to be false.

83.     Ms. Levi then told Officer West, "OK, thank you, but I need to go to Shands now."

84.     Officer West then told her, "You're not allowed to drive yourself.  An officer has to drive you."  Ms. Levi suggested that Mr. Jones could drive her, but Officer West said, "No, it's protocol that an officer has to drive you."

85.     Moments later, without explanation, all of the CCSO officers except Officer Mack departed from the OPHED without Ms. Levi, Ms. Laughter, or Mr. Jones.

86.     Befuddled, Ms. Levi asked Officer Mack, "What about me getting a ride to Shands?"

87.     Officer Mack replied, "Oh, you can drive yourself."

88.      So, Mr. Jones drove Ms. Levi and Ms. Laughter to UF-Shands Hospital.

89.     Later in the evening, agents from the Florida Department of Law Enforcement (the "FDLE"), along with Detective Smith, sought to interview Ms. Levi.

90.     The FDLE agent began by saying, "I understand that we have permission to search your home."

91.     Ms. Levi responded, "No, I haven't given you permission to search my home."

92.     The FDLE agent, appearing stunned, turned to the other officers, who also exhibited looks of surprise.

93.     Another officer then retorted, "Well, you have a sheet in your notebook; just get her to sign one now."

94.     Ms. Levi then asked, "What are you looking for?"

95.     One of the officers then explained, "I don't know; I'm here with you.  But, we have a crew outside your house, waiting to search your house."

96.     Indeed, by that point, officers with the CCSO had already ransacked Ms. Levi's home and carried several large bags of personal property from the home.

97.     Ms. Levi, believing that her home still had not been searched, then told the officers, "Well, call and ask them what you're looking for.  I don't understand.  My son didn't die in my home.  You shouldn't need to search my home."

98.     At that point, the FDLE agent changed the subject and began asking Ms. Levi questions like, "Was he a happy baby?"  "Was he born on time?"

99.     After nearly forty-five minutes of questioning, Ms. Levi stopped the questioning and explained to the officers that she had to leave because (1) she had not had the opportunity to tell any of her family members about Hadrian's death, and (2) she had to work the following day.  "So, no one searches the house tonight," she told them.

100.    At this point, it was after midnight, and Ms. Levi went outside to smoke a cigarette.  She then got a phone call from her daughter, Anjelica, who had already heard about Hadrian's death.  Ms. Levi was furious with Ms. Laughter, because Ms. Levi believed that Ms. Laughter had told Anjelica about Hadrian's death.

101.    In fact, Anjelica had learned about Hadrian's death from news reports, after the CCSO had already issued a press release, identifying Hadrian by name, and reporting that he had died.

102.    Plaintiff has retained The Bonderud Law Firm, P.A. and agreed to pay a reasonable attorney fee for the prosecution of this lawsuit.

103.    All conditions precedent to Plaintiff's recovery in this action have occurred, accrued, or been waived as a matter of law.

104.    Plaintiff provided written pre-suit notice of her claims, pursuant to FLA. STAT. § 768.28 on August 28, 2014, to both Sheriff Beseler and the Florida Department of Financial Services, Division of Legal Services.

**COUNT I**
**Angela Levi vs. Sheriff Beseler**
**Fourth Amendment (*Monell*) Claims – 42 U.S.C. §§ 1983, 1988**

105.    Ms. Levi realleges and incorporates by reference paragraphs one (1) through one hundred four (104) above, as though fully set forth herein.

106.    Ms. Levi brings a claim pursuant to 42 U.S.C. §§ 1983 and 1988 against Sheriff Beseler for deprivation of civil rights under color of state law.

107.    Sheriff Beseler, its agents and employees, acting within their authority and under color of state law, instituted and followed practices, customs, policies, and protocols, which were the moving force in the deprivation of Ms. Levi's right to be free from unreasonable searches and seizures, which is actionable under 42 U.S.C. § 1983, as a violation of the Fourth Amendment to the United States Constitution.

108.    Officer Mack and Officer West directly and proximately caused other CCSO officers to enter the inside of Ms. Levi's home and search it without consent or lawful authority.

Although Ms. Laughter provided limited consent for the CCSO to enter and search the home for the exclusive purpose of finding Hadrian, this limited consent was vitiated when the CCSO discovered that Hadrian was no longer in the Ms. Levi's home. Nevertheless, after Hadrian was transported to the OPHED, CCSO officers entered and searched Ms. Levi's home, leaving it as though the home had been ransacked by burglars. CCSO officers, without consent or other authority, also removed several items of personal property from Ms. Levi's home.

109. Officer Mack and Officer West also detained Ms. Levi for several hours, against her will, without authority or color of authority, and in a manner that was unreasonable and unwarranted under the circumstances.

110. As a direct and proximate result of the conduct of Sheriff Beseler described above, Ms. Levi has suffered grievously, including but not limited to severe emotional distress.

111. As a further direct and proximate result of the conduct of Sheriff Beseler, Ms. Levi suffered loss of liberty and freedom, pain and suffering, mental anguish, and loss of capacity for the enjoyment of life. Ms. Levi's losses are either permanent or continuing and Ms. Levi will suffer the losses in the future, in violation of Ms. Levi's civil rights.

112. Ms. Levi has also agreed to pay the undersigned a reasonable fee for legal services, herein.

**WHEREFORE**, Ms. Levi prays:

a. Judgment for compensatory damages;

b. Cost of suit;

c. Reasonable attorney's fees, pursuant to 42 U.S.C. § 1988;

d. Trial by jury as to all issues so triable; and

e. Such other and further relief as this Honorable Court deems just and appropriate.

**Angela Levi vs. Officer Mack and Officer West**
**Fourth Amendment Claims – 42 U.S.C. §§ 1983, 1988**

113.    Ms. Levi realleges and incorporates by reference paragraphs one (1) through one hundred four (104) above, as though fully set forth herein.

114.    Ms. Levi brings a claim pursuant to 42 U.S.C. §§ 1983 and 1988 against Officer Mack and Officer West for deprivation of civil rights under color of state law.

115.    Officer Mack and Officer West, in their individual capacities, deprived Ms. Levi of her Fourth Amendment right to be free from unreasonable searches and seizures.

116.    Specifically, Ms. Levi alleges that Officer Mack and Officer West directly and proximately caused other CCSO officers to enter the inside of Ms. Levi's home and search it without consent or lawful authority.  Although Ms. Laughter provided limited consent for the CCSO to enter and search the home for the exclusive purpose of finding Hadrian, this limited consent was vitiated when the CCSO discovered that Hadrian was no longer in the Ms. Levi's home.  Nevertheless, after Hadrian was transported to the OPHED, CCSO officers entered and searched Ms. Levi's home, leaving it as though the home had been ransacked by burglars.  CCSO officers, without consent or other authority, also removed several items of personal property from Ms. Levi's home.

117.    Ms. Levi further alleges that Officer Mack and Officer West detained her for several hours, against her will, without authority or color of authority, and in a manner that was unreasonable and unwarranted under the circumstances.

118.    The conduct of Officer Mack and Officer West was objectively unreasonable, in violation of Ms. Levi's clearly established rights under the Fourth and Fourteenth Amendments

and 42 U.S.C. § 1983, in the absence of reasonable suspicion that Ms. Levi had committed, was committing, or was about to commit any criminal offense.

119.    As a direct and proximate result of the conduct of Officer Mack and Officer West described above, Ms. Levi has suffered grievously, including but not limited to severe emotional distress.

120.    As a further direct and proximate result of the conduct of Officer Mack and Officer West, Ms. Levi suffered loss of liberty and freedom, pain and suffering, mental anguish, and loss of capacity for the enjoyment of life.  Ms. Levi's losses are either permanent or continuing and Ms. Levi will suffer the losses in the future, in violation of Ms. Levi's civil rights.

121.    Ms. Levi has also agreed to pay the undersigned a reasonable fee for legal services, herein.

**WHEREFORE**, Ms. Levi prays:

a.    Judgment for compensatory damages;

b.    Judgment for exemplary damages;

c.    Cost of suit;

d.    Reasonable attorney's fees, pursuant to 42 U.S.C. § 1988;

e.    Trial by jury as to all issues so triable; and

f.    Such other and further relief as this Honorable Court deems just and appropriate.

**COUNT III**
**Angela Levi vs. Sheriff Beseler**
**False Arrest/False Imprisonment Claim Under Florida Law**

122.    Ms. Levi realleges and incorporates by reference paragraphs one (1) through one hundred four (104) above, as though fully set forth herein.

123. Officer Mack and Officer West directly and proximately caused Ms. Levi's arrest or detention in the absence of probable cause to believe that Ms. Levi had committed any criminal offense. The actions of Officer Mack and Officer West, in causing the arrest or detention of Ms. Levi, were taken in the absence of lawful authority.

124. Alternatively, the actions of Officer Mack and Officer West, were taken in absence of reasonable suspicion that Ms. Levi had committed, was committing, or was about to commit any criminal offense.

125. The actions of Officer Mack and Officer West constitute false arrest/false imprisonment of Ms. Levi under Florida law.

126. The false arrest/false imprisonment of Ms. Levi was committed by Officer Mack and Officer West in the course and scope of their employment as deputy sheriffs for Sheriff Beseler.

127. As a direct and proximate result of the conduct of Officer Mack and Officer West described above, Ms. Levi has suffered grievously, including but not limited to severe emotional distress.

128. As a further direct and proximate result of the conduct of Officer Mack and Officer West, Ms. Levi suffered loss of liberty and freedom, pain and suffering, mental anguish, and loss of capacity for the enjoyment of life. Ms. Levi's losses are either permanent or continuing and Ms. Levi will suffer the losses in the future, in violation of Ms. Levi's rights.

**WHEREFORE**, Ms. Levi prays:

a. Judgment for compensatory damages;

b. Cost of suit;

c. Trial by jury as to all issues so triable; and

d. Such other and further relief as this Honorable Court deems just and appropriate.

**COUNT IV**
**Angela Levi vs. Officer Mack and Officer West**
**False Arrest/False Imprisonment Claim Under Florida Law**

129.     Ms. Levi realleges and incorporates by reference paragraphs one (1) through one hundred four (104) above, as though fully set forth herein.

130.     Officer Mack and Officer West directly and proximately caused Ms. Levi's arrest or detention in the absence of probable cause to believe that Ms. Levi had committed any criminal offense.   The actions of Officer Mack and Officer West, in causing the arrest or detention of Ms. Levi, were taken in the absence of lawful authority.

131.     Alternatively, the actions of Officer Mack and Officer West, were taken in absence of reasonable suspicion that Ms. Levi had committed, was committing, or was about to commit any criminal offense.

132.     The actions of Officer Mack and Officer West constitute false arrest/false imprisonment of Ms. Levi under Florida law.

133.     Alternatively to the allegations set forth in Count V, if the arrest or detention of Ms. Levi by Officer Mack and Officer West was committed outside the course and scope of their employment, or in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property, the conduct of Officer Mack and Officer West occurred in their individual capacities.

134.     As a direct and proximate result of the conduct of Officer Mack and Officer West described above, Ms. Levi has suffered grievously, including but not limited to severe emotional distress.

135.    As a further direct and proximate result of the conduct of Officer Mack and Officer West, Ms. Levi suffered loss of liberty and freedom, pain and suffering, mental anguish, and loss of capacity for the enjoyment of life.  Ms. Levi's losses are either permanent or continuing and Ms. Levi will suffer the losses in the future, in violation of Ms. Levi's rights.

**WHEREFORE**, Ms. Levi prays:

a.   Judgment for compensatory damages;

b.   Judgment for exemplary damages;

c.   Cost of suit;

d.   Trial by jury as to all issues so triable; and

e.   Such other and further relief as this Honorable Court deems just and appropriate.


**COUNT V**
**Angela Levi vs. Officer Mack and Officer West**
**Intentional Infliction of Emotional Distress Under Florida Law**

136.    Ms. Levi realleges and incorporates by reference paragraphs one (1) through one hundred four (104) above, as though fully set forth herein.

137.    Alternatively to the allegations set forth in Count V, the conduct of Officer Mack and Officer West was committed outside the course and scope of their employment with Sheriff Beseler, or in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.

138.    Officer Mack and Officer West are liable to Ms. Laughter for intentional infliction of emotional distress under Florida law.

139.     The conduct of Officer Mack and Officer West was intentional or reckless – that is, they intended their behavior knowing, or they should have known, that emotional distress would likely result.

140.     The conduct of Officer Mack and Officer West was outrageous, as it went beyond all bounds of decency and is regarded as odious and utterly intolerable in a civilized community.

141.     The conduct of Officer Mack and Officer West caused Ms. Laughter to suffer severe emotional distress.

**WHEREFORE**, Ms. Levi prays:

a.  Judgment for compensatory damages;

b.  Judgment for exemplary damages;

c.  Cost of suit;

d.  Trial by jury as to all issues so triable; and

e.  Such other and further relief as this Honorable Court deems just and appropriate.

## DEMAND FOR JURY TRIAL

142.     Ms. Levi demands a trial by jury on all issues so triable as of right.

Submitted April 14, 2015, by:                    **The Bonderud Law Firm, P.A.**

*/s/ Andrew Bonderud*
Andrew M. Bonderud, Esq.
**Trial Counsel**
Florida Bar No. 102178
814 A1A North, Suite 202
Ponte Vedra Beach, FL 32082
904-438-8082 (telephone)
904-800-1482 (facsimile)
E-Mail: BonderudLaw@gmail.com
*Attorney for Plaintiff*

**CERTIFICATE OF SERVICE**

The undersigned attorney hereby certifies that on April 14, 2015, a true and correct copy of the foregoing document was forwarded by electronic means through the Court's ECF System to Keith Tischler, Esq., Jolly & Peterson, P.A., Post Office Box 37400, Tallahassee, Florida 32315.

/s/ *Andrew Bonderud*
Attorney